STATE of Missouri, Respondent,

v.

Ronald Dean BATES, Appellant.

No. KCD 27898.

Missouri Court of Appeals,
Kansas City District.

Aug. 2, 1976.

Motion for Rehearing and/or Transfer
Denied Aug. 30, 1976.

Thomas M. Larson, Public Defender, E. L. Messina, Asst. Public Defender, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and SWOFFORD and SOMERVILLE, JJ.

SWOFFORD, Judge.

The appellant (hereafter defendant) was charged in an indictment in two counts, of Robbery First Degree. The second count was dismissed by the state and the defendant proceeded to trial before a jury. The jury found him guilty and assessed his punishment at ten (10) years. After his motion for a new trial was overruled, he was given allocution, sentenced, and prosecutes this timely appeal.

The defendant raises two assignments of error: *First,* that the court erred in admitting certain state's exhibits and testimony relating thereto, for the reason that said exhibits and testimony were admitted after a timely motion to suppress and over objection, and were the product of an illegal search and seizure; and *second,* the court erred in admitting State's Exhibits 8a, 8b, 8c and 8d, four .38 caliber bullets, for the reason that these exhibits were highly inflammatory, which fact outweighed any relevance or materiality they might have had with respect to any issues in the case.

Before trial, the defendant filed a motion to suppress one piece of evidence, to-wit, a black billfold, the property of the defendant. During the pretrial hearing on this motion, defense counsel was permitted to orally amend the motion to include the other exhibits which are the subject of the first assignment of error. All of these exhibits, eight in number, were found by law enforcement officials in an automobile in which defendant was riding when he was arrested. These exhibits by number, general description, and place in the automobile where each was found, are as follows:

Exhibit No. 1 Black billfold or wallet owned by defendant and found in the unlocked glove compartment.

Exhibit No. 2 Nylon stocking, knotted near the foot, found above left front sun visor.

Exhibit No. 3 Withdrawal slip from a class, Longview Community College, name of Sam Levine, found on right front floorboard.

Exhibit No. 4 Letter from Longview Community College to Sam Levine found on right front floorboard.

Exhibit No. 5 List of names and telephone numbers which secretary had taken down for Sam Levine, found on right front floorboard.

Exhibit No. 7 Bullet, found in the back of the right rear seat.

Exhibit No. 13 Stocking cap. Record is not clear as to where this was found.

Exhibit No. 14 Photograph of two key rings and keys—Officer Peterson stated that these were found in the automobile and in plain view and were photographed and returned to Sam Levine.

At the conclusion of the pretrial hearing, the motion to suppress this evidence was overruled.

The record on appeal reveals that on October 12, 1974, shortly before 9:00 p. m., Max Levine, owner of the Sunshine Market at 2126 East 39th Street (39th and Brooklyn), Kansas City, Missouri, his son, Sam Levine, and an employee were preparing to close the store. Three black males entered the store and two of them carried guns. Max Levine and the employee were forced to lie on the floor; the robbers were unable to open the cash register and thereupon forced Max Levine to open it; when he did so, a burglar alarm was activated; one of the robbers took the paper money from the register; they took Sam Levine's billfold and two sets of keys from his person, and fled the store. At a police lineup a short time after the robbery, both Max and Sam Levine identified a man, other than defendant, as being one of the participants in the robbery. Neither could identify the defendant at the lineup or at trial.

The testimony of the police officers involved in this matter (substantially the same at both the hearing on the motion to suppress and at the trial) revealed that Officers Halteman and Florea were togeth-

er in a police vehicle in the vicinity of 43rd and Lydia at approximately 9:00 p. m. on October 12, 1974, when they received a radio dispatch that there was a "robbery alarm" at the Sunshine Market. They immediately started toward the Sunshine Market and while their vehicle was headed north on Woodland (in approximately the 4000 block), Halteman observed a four-door white vinyl over green Cadillac automobile headed south on Woodland, away from the vicinity of the market, at a speed of 40–45 m.p.h. He observed a man in the back seat of the Cadillac wearing a stocking cap or ski mask "pulled down to his eyes" and because this Cadillac was "leaving the scene of the robbery" speeding, and the occupants looked "apprehensive", Halteman turned the police vehicle around and started to pursue the Cadillac. At about 43rd and Woodland, the police turned on the red lights, siren and spotlight, and adjusted the headlights to high beam. The Cadillac thereupon speeded up and traveled about three more blocks and headed back north. At 40th and Michigan, the driver of the Cadillac stopped it in the middle of the intersection and fled on foot. Halteman chased this man, caught him, and placed him under arrest. In the meantime, Officer Florea with pistol drawn "apprehended" the remaining two occupants of the Cadillac who were still seated therein. One of these was the defendant, although there is some conflict in the evidence as to whether he was seated in the front or back seat.

The three men under arrest were taken to police headquarters and the police had the Cadillac towed to the police garage at headquarters because it was a rainy night and a crowd was gathering. From the time the police first observed the Cadillac until sometime after its three occupants were taken into custody, the police had no description of the robbers of the Sunshine Market but only the information that a robbery alarm had sounded from that store.

In the search of the driver of the Cadillac following his apprehension, Officer Halteman found four .38 caliber bullets (Exhibits 8a, 8b, 8c and 8d) the subject of defendant's second point relied upon.

Donald E. Peterson, evidence technician for the Kansas City Police Department, processed the Cadillac automobile at the police garage beginning at about 9:30 p. m. on October 12, 1974. He had no search warrant. He testified he found the defendant's billfold (Exhibit No. 1) in the unlocked glove compartment. He also found the other exhibits in the automobile, most of which were in plain view. When asked on cross-examination, "And what was your purpose in searching the glove box?", he responded, "Ownership of the automobile. Any evidence available."

James Glasgow, pastor of a church, testified that his car was parked in the 4000 block on Michigan while he visited with a family on that street. At around 9:00 p. m., he noticed a speeding car and heard a siren. He found that "a lot of papers (were) all over his car", apparently held there by the rain. He also found a wallet and more papers near his car. There was an American Red Cross identification card in the wallet and some of the papers had the name of Levine on them. He turned the wallet and papers over to the police at the scene of the arrests, but apparently they were never offered as evidence.

Ronald D. Bates, the defendant, testified in his own behalf at both the hearing on the motion to suppress and at the trial.

In addition to his denial that he had in any way participated in the robbery of the Sunshine Market, he testified that on October 12, 1974, he was coming from his girl friend's house on East 41st Street, on foot, en route to his grandmother's house at 34th and Park; at around 40th or 41st and Woodland, he was given a ride in the Cadillac; that he sat on the back seat of the car on the left-hand side; that when he got in the car, there were three other men in the car, so that he made the fourth occupant; that he had seen the other three men but did not know their names; that he had only been in the car about a minute when the police began chasing it; that when the siren and red light came on, the driver said he

was not going to stop because he did not have a driver's license; and that when the arrests were made, the fourth occupant of the Cadillac must have "vanished". He also stated that his billfold was on his person when he was arrested and "patted down" and that it was taken by the police from his person and not from the glove compartment of the car. The record is silent as to the identity of the other two men arrested and as to the ownership of the Cadillac.

Sam Levine identified his billfold (secured by Rev. Glasgow), the papers and his two sets of keys, at the police station about 45 minutes after the robbery.

A resolution of defendant's first assignment of error focuses attention upon two areas. It must first be determined if, upon this record, the defendant has standing to challenge the constitutional validity of the search of the Cadillac automobile and the seizure of the objects which constitute the exhibits described above. If he did not enjoy such standing, his first point must be ruled against him, regardless of the character or legality of the search and seizure.

Of course, defendant stoutly asserts that he did have standing to challenge the search and seizure and, to maintain that position, relies strongly upon the case of Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). It is true that in Jones, the court discarded the distinctions theretofore drawn by the courts, in cases involving standing to complain of illegal search and seizure—denying such standing based upon the status of "guest", "invitee", "lessee" and "licensee". The Jones court conferred such standing upon a person showing that he was himself the victim of an unlawful invasion of privacy by means of an unlawful search and seizure conducted in his presence, a rule which a later court denominated one of "automatic standing". Jones involved a charge of possession of narcotics which were seized as a result of an unlawful search of an apartment in the presence of defendant but in which he was an invitee or guest only. His motion to suppress the evidence seized was denied because of his lack of standing. Un-

der the then existing law, he would have had to allege ownership or possession of the contraband and a possessory interest in the premises in order to attain standing to challenge the search and seizure, and thus take a position of incrimination and guilt of the very crime with which he was charged, which could then be used against him at a trial on the merits. On the other hand, if he failed to assert in his motion to suppress that he had an interest in the premises or the contraband, he lacked the prerequisite standing and the government could use with impunity the fruits of the allegedly unlawful search and seizure. Upon this premise, the Jones court reasoned in holding that the defendant had standing without alleging ownership or possession.

This obvious "self-incrimination dilemma" was somewhat ameliorated in the case of Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), which held that a prosecutor may not use against a defendant at trial any testimony given by that defendant at a pretrial hearing to establish standing to move to suppress evidence (88 S.Ct. at l.c. 973–976).

Likewise, the "automatic standing" rule of Jones v. United States, supra, was further refined and clarified in Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, l.c. 1569[1, 2], 36 L.Ed.2d 208 (1973), wherein the court said:

"* * * there is no standing to contest a search and seizure where, as here, the defendants: (a) were not on the premises at the time of the contested search and seizure; (b) alleged no proprietary or possessory interest in the premises; and (c) were not charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure. * * * "

This federal decisional formula is applicable and binding in the determination of the matter of defendant's standing in the case at bar.

Nor is the present decisional law of Missouri in any conflict with Brown v. United

*States,* supra, but is in accord therewith. In *State v. Thompson,* 490 S.W.2d 50, 51–52[1] (Mo.1973), the court held that a defendant had no standing to object to the search and seizure of a stolen automobile in which he was a passenger and in which he claimed no possessory interest. See also: *State v. Ross,* 507 S.W.2d 348, 353[3] (Mo. 1974); *State v. Achter,* 512 S.W.2d 894, 899–900[5, 6, 7] (Mo.App.1974); *State v. Browner,* 514 S.W.2d 355, 356[1] (Mo.App. 1974); *State v. Hornbeck,* 492 S.W.2d 802, 808[10, 12] (Mo.1973).

The defendant here strongly relies on *In re J. R. M.,* 487 S.W.2d 502 (Mo. banc 1972). A careful reading of this decision discloses that it is clearly distinguishable on the facts from the case at bar. That case involved the search and seizure of an automobile owned by the defendant's father. The evidence showed, however, that the defendant regularly had free use of the vehicle for his own purposes, retained a key to it, and was covered by insurance on the vehicle, and thus had at least a constructive possessory or proprietary interest in the "premises". It should also be noted that *In re J. R. M.* was decided prior to *Brown v. United States,* supra, and is distinguished in subsequent Missouri decisions. See: *State v. Thompson,* supra, and *State v. Browner,* supra.

■ The point now under consideration must clearly be governed by the principles of *Brown v. United States,* supra, and the formula therein set forth must be applied. It should be noted that while the "premises" in *Brown* was an apartment and here an automobile, that fact does not weaken the force or logic of the rule nor requires the application of a different standard.

■ The search of the Cadillac automobile was not conducted in defendant's presence and thus the first requirement (a) in *Brown v. United States,* supra, is not met. Further, it is apparent from the record that the defendant did not claim any proprietary or possessory interest in the automobile either in his original written motion to suppress, the oral amendment thereto, or in his testimony. Nor was such an interest shown from any other source. He, therefore, failed to meet the requirement (b) in *Brown v. United States,* supra.

Finally, the defendant was charged and tried for Robbery First Degree of the Sunshine Market and not for the possession of any of the evidence seized in the automobile search. Stated differently, possession of such evidence would not constitute an essential element of the offense charged against the defendant. He, therefore, fails to bring himself within the ambit of requirement (c) in *Brown v. United States,* supra.

The argument might be advanced (although it is not) that as to Exhibit No. 1, the defendant's billfold, he had such an interest to confer standing to move to suppress that one exhibit. While some cases contain dicta that ownership of the seized evidence lends some color to support standing, the ultimate ruling in *Brown v. United States,* supra, did not make ownership of the evidence (as opposed to the premises) an element of the rule. Further, defendant's billfold (Exhibit No. 1) in the case at bar merely tended to show his presence in the Cadillac, a fact which he admitted. The fact that it was his property does not alter the conclusion reached.

The defendant had no standing to support his motion to suppress the evidence seized in the search of the Cadillac automobile, and his first point is ruled against him.

In connection with defendant's second point, it should be noted at the outset that he does not claim that the four bullets taken from the person of the driver of the Cadillac by Officer Halteman (Exhibits 8a, 8b, 8c and 8d) were irrelevant or immaterial to any of the issues. Rather, his objection and asserted assignment of error is couched in these rather obscure terms, namely, that the bullets:

" * * * WERE *HIGHLY INFLAMMATORY* AND *THEIR INFLAMMATORY NATURE OUTWEIGHED ANY RELEVANCE OR MATERIALITY* THAT THEY MIGHT HAVE HAD WITH RESPECT TO THE ISSUES IN-

VOLVED \* \* \* " (Emphasis sup-, plied)

It would appear, therefore, that he tacitly admits that the bullets had *some* probative value but asks this court to weigh such value against the "inflammatory" and prejudicial effect of their admission as evidence.

■ That the bullets did constitute material and relevant evidence is clear. They were taken from the driver after he abandoned the Cadillac following the police chase and after he had attempted to escape on foot; defendant was admittedly in his company, in the automobile from which the driver fled just before this incident; and, the driver was apprehended just after the armed robbery at a place in the close vicinity of such robbery.

In *State v. Small,* 344 S.W.2d 49 (Mo. 1961), the court held that it was not error to permit the introduction into evidence of six shotgun shells found on the person of defendant's companion when both were apprehended in an automobile from which the defendant allegedly fired a fatal shotgun blast resulting in homicide. The court there said, l.c. 54[3]:

"\* \* \* But, relevancy and probative force aside, it may not be said that the admission of the spent shell or the 6 live shells found on Young was manifestly improper or inflammatory and therefore deprived the appellant of a fair trial \* \* \* "

In *Garton v. State,* 454 S.W.2d 522, 529[7] (Mo.1970), the court refused to convict the trial court of error in admitting a shotgun and shells found in the automobile used by the defendant and alleged accomplices in an armed bank robbery, although such firearm and shells were not used in the robbery. See also: *State v. Kitchen,* 499 S.W.2d 572 (Mo.App.1973) and cases cited therein; *State v. Moore,* 501 S.W.2d 197 (Mo.App. 1973).

■ It seems clear that under the record in this case the bullets taken from the driver were properly received in evidence, in that they constituted evidence relevant to the activities of the defendant and his companions just before the arrest. At least this evidence falls within the rule in *State v. Tevis,* 340 S.W.2d 415, 420[12] (Mo.App. 1960), where the court said:

"\* \* \* Before evidence can be excluded on the ground that it is irrelevant, it is essential that it appear so *beyond a doubt.* If the question of relevancy is doubtful, the settled rule is that the evidence should go to the jury for their own evaluation of it. \* \* \* " (Emphasis supplied)

A corollary of this rule was recently expressed by this court in *State v. Kerr,* 531 S.W.2d 536, 542–543[15, 16] (Mo.App.1975), where it was held that in the absence of some showing that the receipt into evidence of four live bullets found upon the person of the defendant "inflamed the jury", even though immaterial to the issues, fell within the rule that "admission of facts immaterial to the issues and without probative force cannot constitute prejudicial or reversible error."

■ The record in this case shows that the introduction of the .38 caliber shells was done routinely without overemphasis or undue or repeated reference throughout the trial. Nothing in this record affords any support to a claim that the jury was inflamed or in any way prejudiced by this evidence or by any action or statement of the prosecutor with reference thereto.

The sole authority relied upon by the defendant on his second point is the case of *State v. Merritt,* 460 S.W.2d 591 (Mo.1970). This case is clearly distinguishable from the case at bar and is not authoritative here. In *Merritt,* it was held that it was error to permit the state to introduce into evidence in an assault with intent to kill prosecution, a handgun found in the snow near the scene of the shooting the following day. There was no showing that this gun was the one used in the assault or was in *any way connected with the crime or with the defendant.*

The defendant's second point is ruled against him.

The judgment is affirmed.

All concur.